FILED
2013 Jun-18 AM 08:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JAHARI SAILES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **CASE NO. 12-CV-150-KOB** |
| **LANSING BUILDING PRODUCTS,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case, asserting claims of racial discrimination and retaliation brought pursuant to Title VII and Section 1981, is before the court on "Defendant Lansing Building Products, Inc.'s Motion for Summary Judgment." (Doc. 23). The Plaintiff filed a response to the motion (doc. 26) with supporting affidavits (docs. 26-28 & 30), and the Defendant filed a reply (doc. 31). For the reasons stated in this Memorandum Opinion, the court FINDS as follows: the motion for summary judgment is due to be DENIED as to the claim in Count I for disparate pay regarding the period commencing in August of 2010, and is due to be GRANTED as to the failure-to-promote claim in Count II. The court further FINDS that all remaining claims in Count I, and all claims in Counts III, IV, and V are due to be DISMISSED WITH PREJUDICE because of abandonment.

## I. LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a

district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) Substantive law determines which facts are material and which are irrelevant. *Id*. at 248. In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999). (citing *Celotex,* 477 U.S. at 324). If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## II.  FACTS

The Plaintiff, Jahari F. Sailes, filed a Complaint on January 17, 2012, asserting the following claims against the Defendant, Lansing Building Products, Inc.: Count I - entitled "Race Discrimination in Pay"; Count II - entitled "Race Discrimination in Promotion" and focusing upon the failure to hire Sailes as Warehouse Manager in February of 2011; Count III - entitled "Race Discrimination in Terms and Conditions of Employment" and focusing upon the failure to hire Sailes as Warehouse Manager in February of 2011; Count IV - entitled "Race Discrimination in Discipline" and focusing on discipline Sailes received in April of 2011; Count V - entitled "Retaliation" and focusing on adverse actions that occurred after Salies filed a charge of discrimination on February 18, 2011.

The court views the following facts in the light most favorable to Sailes, the non-movant, where a genuine dispute exists. *See Ricci v. DeStafano*, 557 U.S. 557, 586 (2009).

Lansing operates a building materials and supply company. It uses two trucks to deliver products to customers, and a CDL driver must operate one of the two trucks.

*Sailes's Application and Hiring*

In July of 2007, Sailes, who is African-American, applied for employment with Lansing as a Warehouse/Driver. On his employment application, Sailes listed three previous employers in reverse sequence: Mayer Electric, where he worked in the warehouse and did some delivery driving and stocking; Bruce Office Supply, where he worked as a delivery driver; and Henry Penick and Associates, a law firm, where he worked as a runner. When asked on the application to list "Skills and Qualification," Lansing listed none. At time of the application, Lansing did not have a Commercial Driver's License ("CDL"), had never been in the military, and had not taken a management course with a total quality approach. Lansing hired Sailes in July of 2007 as a Warehouse/Driver, a position that requires loading and unloading of truckloads of construction building materials and is the lowest paying job at Lansing.

At the time of his hiring, Sailes was the only African American holding the position of Driver/Warehouse at the Birmingham location. Lansing paid Sailes the minimum starting hourly pay rate of $12.50. No evidence presented to the court reflects the identity of the person at Lansing that set his initial pay rate or the factors considered when setting that rate, except that $12.50 is the amount Sailes requested on his application. From that point, Sailes received an increase of .$50 in December of 2007 to $13.00/hour; an additional $.50 in February of 2008 to $13.50/hour; a pay cut company-wide in January of 2009 to $12.83/hour; an increase to $13.50/hour in August 2, 2010; and an increase in November of 2011 retroactively effective as of July or August of 2011 to $13.77/hour.

*Hood's Application and Hiring*

Sailes offers Glenn Hood, who is white, as a comparator. In April of 2010, Hood applied for employment with Lansing as a CDL Driver; he held a CDL license at the time of his application. The "Skills and Qualifications" section of the application reflects that Hood attended "Air Force Leadership School, Total Quality Approach to Management." The record does not reflect whether Hood wrote that information on the application or whether another person did. Lansing hired Hood in 2010 as a CDL Driver with a starting hourly pay rate of $14.00. No evidence presented to the court states the identity of the person at Lansing that set Hood's initial pay rate or the factors considered when setting that rate. Sailes acknowledged that Hood's possession of a CDL was a factor that distinguished Hood from Sailes before Sailes obtained that license.

*Sailes Obtains a CDL*

On July 21, 2010, Brian Long, Lansing's Branch Manager, issued to Sailes a Counseling Action, stating that Lansing needed a back-up CDL driver and giving Sailes thirty days to obtain a CDL as a condition of continued employment with Lansing. Sailes does not assert that race was a motivating factor in Lansing's decision to require Sailes to obtain a CDL. The Counseling Action reflected that Sailes had previously attempted to obtain a CDL but had failed at that particular time to pass the requisite testing procedure. During the time-period after issuing the counseling action, Lansing supported Sailes's attempts to obtain a CDL, providing him with study materials, paying for the CDL test each time Sailes took it, and paying him his hourly rate to take the CDL test. After failing the CDL test approximately seven times, Sailes finally passed it and obtained his CDL in August of 2010. While Long was employed as Lansing's Branch

Manager, Sailes was the only African-American employee at the Birmingham location.

At some point, Lansing employees were subject to an across-the-board pay freeze caused by economic conditions, and, as noted previously, Sailes and other employees received a pay cut effective January of 2009. However, Sailes's pay records reflect that he returned to his previous pay rate of $13.50/hour effective August 2, 2010. Lansing did not provide a pay increase to Sailes when he obtained his CDL in August of 2010. Sailes cannot identify a white employee who did not have a CDL upon hire but who later obtained his CDL and received a pay raise on that account.

*Lansing's History Regarding Pay Raises*

Long does not recall giving any employee a pay raise prior to November of 2011, other than a cost-of-living adjustment.

*The Warehouse Manager Position*

In January of 2011, Long terminated the person who held the position of Warehouse Manager. Long subsequently interviewed Sailes and Hood for that vacant position. Hood's application for employment at Lansing indicated that Hood had been a crew chief in the Air Force. Sailes's application, on the other hand, reflected that he had experience in the building materials industry but neither his application nor any evidence of record reflects that as of January of 2011 Sailes had any experience in a management role. At the time Long was making the decision on filling the Warehouse Manager position, he had no knowledge that Sailes had any management experience. Salies testified, however, that he had advised Long in the interview for the Warehouse Manager position that a former Warehouse Manager named Jimmy Bryant, who no longer held that position at Lansing and who was not part of the promotion decision, had

provided some training to him about "how the manager position went and the things I needed to be aware of as a manager and how to regulate the warehouse as warehouse manager."

During Hood's interview for the Warehouse Manager position, Long asked Hood how he would lead and what he would do were he offered the position, and Hood provided some recommendations about changes he would make if given the opportunity. By contrast, Long does not recall Sailes suggesting any recommended changes at the warehouse, and Sailes stated in his affidavit that he did not offer any specific recommendations about improvements, because Long did not ask for any.

In February of 2011, Long selected Hood to be Warehouse Manger. Long explains that the reasons he chose Hood over Sailes included the following: Long's judgment that Sailes would perform better with his customers on his driving route; Long's perception that Hood was the more motivated employee; Hood's Air Force experience as a crew chief and his attendance at Air Force leadership school with a "Total Quality Approach to Management" course; Sailes's difficulty in obtaining the CDL with repeated initial failures to pass the CDL test; and input from other Lansing employees, including input from the Operations Manager who recommended Hood for the job. Long did not consider seniority at Lansing when making the employment decision.

*EEOC Charge and Resignation*

On February 18, 2011, Sailes filed a charge of discrimination with the EEOC. That charge asserted discrimination based on race, claiming that he was being paid less than white drivers who have a CDL license and that a less qualified white employee with less seniority was chosen for a promotion to a management position.

On May 23, 2011, Sailes's attorney requested that the charge be amended to reflect

retaliation, referencing unfair discipline that occurred after the filing of the EEOC charge.

On November 18, 2011, Lansing increased Sailes's hourly rate to $13.77, retroactive to the date he obtained his CDL, and provided him with a check for the retroactive pay. This pay did not include interest on the back wages.

In February of 2012, Sailes resigned his employment at Lansing, and he claims that the resignation was because of the disrespectful and discriminatory treatment he received at work. After Sales left Lansing, the Birmingham work force consisted of all white males.

## III. DISCUSSION

### A. Abandoned Counts

Sailes's Complaint contains five counts. Lansing's motion for summary judgment and supporting brief addressed all five counts, but Sailes's response only addressed the first two counts. Further, Sailes's brief does not address all disparate pay claims originally asserted in Count I of his Complaint. Although Lansing's brief addresses all of the disparate pay theories raised in Count I, Sailes's response only discusses the disparate pay rate that existed between Sailes and his comparator Hood *after* Sailes became CDL certified in August of 2010. Therefore, as Lansing properly points out in its reply brief, Sailes has effectively abandoned the claims asserted in Counts III-V, and any claim in Count I for disparate pay *other than* the Hood-Sailes comparison commencing in August of 2010. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (stating that a party "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions"); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue

this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"). Accordingly, the court finds that the abandoned claims are due to be DISMISSED WITH PREJUDICE. The court will proceed to address the remaining claims.

**B. Count I - Disparate Pay Beginning August 2010**

The remaining claim in Count I is for disparate pay *after* Sailes received his CDL in August of 2010. This pay claim is the only one that Sailes addressed in his responsive brief. In his brief, Salies lists the period of disparate pay as August of 2010 through November 18, 2011. While the court understands why Sailes commences this period in August of 2010, it is unsure why Sailes ends the disparate pay period at November 18, 2011. That day marks Sailes's receipt of a pay increase to $13.77/hour, but because that wage is still less than the comparator's wage of $14.00/hour, the end date is perplexing. However, a plaintiff is the master of his own action, and can limit the period during which he asserts his disparate pay claim, if he so chooses.

In any event, because this is a circumstantial evidence case, the court must evaluate Sailes's discrimination claim under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802-03 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). That framework first requires a plaintiff to prove a *prima facie* case of discrimination.

*Prima facie Case*

To establish a *prima facie* disparate pay case pursuant to Title VII and Section 1981, a plaintiff must demonstrate that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." *Crawford v. Carroll,* 529 F.3d 961, 974-75 (11th Cir. 2008) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir. 1994)). The

comparator whom a plaintiff identifies "must be similarly situated in all relevant aspects." *Holified v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), and "must be nearly identical to the plaintiff." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004). Put another way, the plaintiff's comparator must perform the same type of tasks that the plaintiff performs at work. *Cooper v. Southern Co.,* 390 F.3d 695, 735 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam).

In the instant case, Sailes identified Hood as a comparator. As stated in the fact section of this Memorandum Opinion, Lansing uses two trucks to deliver its products, and one of the trucks requires a CDL driver to operate it. Lansing initially hired Sailes as a non-CDL driver and Hood as a CDL driver, and that distinction meant that their qualifications and tasks were not identical because Sailes was eligible to drive only one truck whereas Hood was eligible to drive both. Perhaps acknowledging that difference, Sailes does not now argue that Hood represented a comparator until August of 2010, when Sailes obtained his CDL and became eligible to drive both trucks.

Sailes has presented undisputed evidence that Sailes, an African American, and Hood, a Caucasian, performed the same job, Warehouse/Driver, from August of 2010 until Hood was promoted to Warehouse Manager; that both possessed a CDL during that period and could drive both company trucks; but that Sailes received wages of $13.50[1]/hour and Hood received wages of $14.00/hour. Salies argues that this evidence establishes his *prima facie* case.

Lansing argues, however, that Sailes cannot establish his *prima facie* case because no

[1] The court notes that the wage issued to Salies on November 18, 2011 retroactively back to July or August of 2010 was $13.77/hour, still less than the $14.00/hour wage provided to comparator Hood.

similarly situated comparator exists. Lansing claims that it does not give employees raises, other than a cost-of-living adjustments, so that Sailes's obtaining a CDL would not automatically entitle him to a raise. Lansing also argues that at the time Sailes obtained his CDL, Lansing employees were subject to an across-the-board pay freeze. In light of those circumstances, Lansing insists that the only appropriate comparator for Sailes would be a white employee who was hired as a non-CDL driver, subsequently obtained his CDL, and received a pay raise on that account, or received such a pay raise despite the pay freeze. Because no such employee exists, Lansing argues that Sailes cannot identify an appropriate comparator and cannot establish his *prima facie* case.

The court finds that Lansing's arguments are not well-taken. Regarding the across-the-board freeze, evidence exists supporting Sailes's position that the freeze was not in place during the period in question beginning in August of 2010. Rather, the evidence reflects that Sailes received a pay increase from $12.83/hour to $13.50/hour effective August 2, 2010, and Sailes's affidavit states that this increase marked the end of the pay freeze. This evidence presents at least a genuine issue of material fact as to whether a pay freeze had already been lifted before the relevant period. Further, the court notes that when Lansing raised Sailes's pay to $13.77/hour retroactively, it did so effective July or August of 2010. The evidence does not reflect that when Lansing provided the retroactive pay increase, it exempted any months because a freeze had been in effect or that Lansing expressly stated that the delay in receiving the pay raise was the result of the pay freeze.

As to Lansing's other argument about the lack of a similarly situated comparator, the court disagrees with Lansing's overly-restrictive application of the Eleventh Circuit's definition of

comparator. As of August of 2010 and until Hood received his promotion, Hood and Sailes occupied the identical position and performed the identical tasks because both had CDL licenses at that point and could drive both trucks. Therefore, the court FINDS that Hood is a similarly situated employee beginning in August of 2010, and further FINDS that Sailes has established his *prima facie* case of disparate pay based on race.

*Legitimate, Non-Discriminatory Reasons and Pretext*

In its reply brief, Lansing argues that even if Sailes has established his *prima facie* case on the disparate pay issue, he has not argued in the discussion section of his brief that Lansing's reason for the disparity is pretext for discrimination, and thus, has abandoned any pretext argument. Using the *McDonnell-Douglas* framework, after the establishment of Salies's *prima facie* case, Lansing must articulate a legally sufficient reason for paying Hood more than Sailes, and if it has done so, the burden shifts to Sailes to establish that Lansing's reason is pretext. *See McDonnell Douglas,* 411 U.S. at 802.

The court disagrees that Sailes abandoned any pretext argument on the disparate pay claim. Although Sailes abandoned other claims, he responded to Lansing's argument regarding the disparate pay claim for the period beginning August of 2010. Admittedly, his discussion of the issue should not be used as a template for plaintiffs in disparate pay actions. However, Lansing's argument focused on the *prima facie* case and, most particularly, on whether Sailes established a similarly situated comparator, and Sailes did respond to that argument. If Lansing expected to win on the comparator issue, and thus, did not spill ink in its initial brief on the next steps – legitimate, non-discriminator reason for the pay discrepancy and pretext – then the court would be harsh to expect Sailes to respond to arguments that the original brief either did not

articulate or did so obscurely that Sailes did not recognize them. The court points out that no where in Lansing's discussion of Count I's Disparate Pay claim in its initial brief does it mention the word "pretext" or the phrase "legitimate, non-discriminatory reason," whereas it mentions "comparator" six times and "similarly situated" or "similar situation" five times. Sailes responded to the comparator issue raised and discussed.

Although the court has determined that Sailes did not abandon the issue of pretext, that finding does not mean that he necessarily wins at the summary judgment stage after establishing his *prima facie* case. If Lansing has articulated a legitimate, non-discriminatory reason for the pay disparity, then Sailes must indeed present evidence establishing that the reason is pretext for discrimination.

Lansing's "legitimate, non-discriminatory reason" for not increasing Salies's pay after he obtained his CDL was the company pay freeze. Because this reason is race-neutral and "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Accordingly, the burden shifts to Salies to meet the pay freeze reason head on with evidence that the reason is a pretext for discrimination.

As to the issue of pretext, the court "'must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 892 (11th Cir. 2011) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

However, as noted previously, Sailes has provided evidence that, when viewed in the light most favorable to him, would establish that he received a pay increase in August of 2010, and thus, supports his testimony that the pay freeze was not in effect at the time he obtained his CDL. Accordingly, Sailes provided evidence that would establish inconsistencies and contradictions in Lansing's proffered reason for the pay disparity. Based upon this evidence, a jury could disbelieve Lansing's reason and believe that the reason was a pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). Therefore, Salies has met the articulated reason for the pay disparity head-on with evidence of pretext, and summary judgment on the pay claim is inappropriate.

The court FINDS that the motion for summary judgment is due to be DENIED as to the disparate pay claim for the period beginning in August of 2010, when Salies obtained his CDL.

**C. Count II - Failure to Promote**

The only other claim that Salies addressed in his responsive brief was the claim set out in Count II of the Complaint: race discrimination in promoting Hood to Warehouse Manager instead of Salies in February 2011. Because no direct evidence of discrimination exists, the court once again evaluates this claim using the *McDonnell-Douglas framework.*

To establish a *prima facie* case of discrimination in a failure to promote case, a plaintiff must show "(1) that [he] is a member of a protected minority; (2) that [he] was qualified and applied for the promotion; (3) that [he] was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were

promoted." *Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000).

In the instant case, Sailes has presented evidence establishing the first three elements: he is African-American; he was arguably qualified for the promotion[2]; and Long chose Hood, a Caucasian, instead. Whether Salies established the fourth element is not as crystal clear. Sailes and Hood held the same position before Hood was promoted, so in some respects their resumés appeared somewhat equal, although Hood had possessed a CDL for a greater length of time and Sailes struggled to obtain his CDL, taking the test about seven times before passing it. On the other hand, Hood enjoyed less seniority at Lansing than Sailes. The court notes that the evidence does not reflect that seniority at Lansing was a consideration for Long, the person making the promotion decision. Regardless, the court need not ponder overlong at this juncture, because, spotting Sailes at the *prima facie* case step, he nevertheless loses at the pretext step, as subsequently discussed.

Assuming *arguendo*, without specifically deciding, that Salies meets his *prima facie* case, the court proceeds to the next step. As its non-discriminatory reasons for choosing Hood over Salies, Lansing states the following: (1) Long's judgment that Sailes would be better with customers on his driving route; (2) Long's perception that Hood was the more motivated

---

[2] In its brief, Lansing does not concede that Salies has met this element, and argues that Sailes cannot meet his *prima facie* case because he has the evidentiary burden of establishing that he was qualified and yet he testified that he did not know the job qualifications. This argument is somewhat disingenuous given that Lansing is the party that would have the information about what, if any, job qualifications existed for that position. However, when Long – the person who made the promotion decision – was asked at his deposition for the list of qualifications for that job, he did not recall what the job posting required as qualifications and could not otherwise provide specific qualifications for the job. If Lansing's own officials could not provide the job qualifications when specifically asked for them, Lansing could hardly fault Salies for not establishing them.

employee; (3) Hood's Air Force experience as a crew chief and participation in Air Force leadership school with a "Total Quality Approach to Management" course; (4) Sailes's difficulty in obtaining the CDL with repeated initial failures of the CDL test; and (5) input from other Lansing employees, including input from the Operations Manager who recommended Hood for the job. Long did not consider seniority at Lansing when making the employment decision.

The court accepts this articulation of non-racial, non-discriminatory, legitimate reasons for the promotion decision, and thus, to the extent, if any, that Sailes has met his *prima facie* case, Sailes must establish that these legitimate business reasons represent a pretext for discrimination.

As Lansing points out in its reply brief, Sailes's brief does not specifically mention pretext and his heading for the Count II discussion asserts that he has made out a *prima facie* but omits any reference to pretext. Because Lansing's initial brief does specifically claim to have "articulated a legitimate, non-discriminatory reason" for failing to select Sailes and then uses the term "pretext" and the standard for establishing pretext when weighing qualifications, Lansing's assertion that Sailes has abandoned any pretext argument hits closer to the mark on the failure-to-promote claim than on the disparate pay claim.

Nevertheless, Sailes's argument that Sailes's qualifications far exceeded Hood's could support not only element four of his *prima facie* case but also pretext if the disparities were indeed of the proper weight and significance, as discussed below. Therefore, rather than find abandonment where Sailes made the pretext argument but failed to specifically label it, the court will proceed to address pretext on the failure-to-promote claim.

To prevail on a pretext argument, Salies must meet each of the proffered reasons head-on and may not merely question "the wisdom of the employer's reason, at least not where ... the

reason is one that might motivate a reasonable employer." *Combs,* 106 F.3d at 1543; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."). However, Sailes fails to meet the reasons head-on and fails to establish that each reason would not motivate a reasonable employer. Instead, he argues that his qualifications far exceeded those of Hood. To the extent that Salies beckons this court to join him in weighing qualifications and quarreling with the business judgment of Lansing's decision-maker, he is asking the court to play an inappropriate role; it does not and should not function as "'a super-personnel department'" to re-examine the employer's business judgments and second-guess whether those decisions were fair and appropriate. *See Wilson*, 376 F.3d at 1092 (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001)). Rather, this court's role is to determine whether the termination, unfair or not, was *discriminatory.*

When, as here, a plaintiff seeks to establish pretext by comparing candidates' qualifications, the Eleventh Circuit has restricted his ability to prevail to narrow circumstances. He cannot show pretext "'by simply arguing or even showing that he was better qualified than the [person] who received the position he coveted.'" *Brooks v. County Comm'r of Jefferson Cnty,* 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Alexander v. Fulton Cnty,* 207 F.3d 1303, 1339 (11th Cir. 2000) (alteration supplied)). Rather, the plaintiff must "show that the disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment could have chosen the candidate selected over the plaintiff for the job in question." *Brooks,* 446 F.3d at 1163 (quoting *Cooper v. Southern Co.,* 300 F.3d 695, 732 (11th

Cir. 2004), *overruled on other grounds, Ash v. Tyson Foods*[3]*,* 546 U.S. 454, 457 (2006)).

With that standard in mind, the court looks at the qualifications of Salies and his comparator, Hood. The court will not weigh the strengths and weaknesses of each man as if it were the personnel manager making the decision, because the Eleventh Circuit and the Supreme Court have cautioned that this court should not take on that role. Rather, the court merely FINDS that Salies has not shown based on the evidence available to Long regarding the two men's qualifications and qualities that no reasonable person would have chosen Hood over Salies. The court simply does not see the required disparity in qualifications. Neither has Salies presented evidence showing that the reasons Long gave for choosing Hood over Salies were untrue, inconsistent with company policies or history, implausible, incoherent or contradicted elsewhere by company actions, writings, etc. *See Ash v. Tyson Foods*, 664 F.3d 883, 892 (11th Cir. 2011). Accordingly, the court FINDS to the extent, if any, that Salies established his *prima facie* case on the failure-to-promote claim, Lansing has articulated legitimate, non-discriminatory reasons for the decision to hire Hood over Salies, and Salies has not established that those reasons are a pretext for discrimination. The motion for summary judgment is due to be GRANTED as to the promotion claim.

---

[3] The Supreme Court in its *Ash* decision disapproved the standard previously employed by the Eleventh Circuit – that "[p]retext can be established through comparing qualification only when the disparity in qualification is so apparent as virtually to jump off the page and slap you in the face," *Ash*, 546 U.S. at 456-57 (internal quotations omitted). Nevertheless, the Supreme Court quoted with approval the standard that the Eleventh Circuit used elsewhere and that this court quotes in its opinion - that "'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Id.* at 457 (quoting *Cooper,* 300 F.3d at 732).

## IV. CONCLUSION

In sum, for the reasons stated above, the court FINDS as follows:

A. The following claims are due to be DISMISSED WITH PREJUDICE because the Plaintiff has abandoned them:

- Count I - all disparate pay claims *except* the claim for disparity between the wages of Salies and Hood in the Warehouse/Driver position *after* Sailes received his CDL in August of 2011;
- Count III in its entirety - entitled "Race Discrimination in Terms and Conditions of Employment" and focusing on his failure to receive the Warehouse Manager position in February of 2011;
- Count IV in its entirety - entitled "Race Discrimination in Discipline" and focusing on discipline Sailes received in April of 2011;
- Count V in its entirety - entitled "Retaliation" and focusing on adverse actions that occurred after Salies filed a charge of discrimination on February 18, 2011.

B. Count I - Disparate Pay: as to the remaining claim in this count, the court FINDS that the motion for summary judgment is due to be DENIED.

C. Count II - Failure-to-Promote: As to the claims in this count, the court FINDS that the motion for summary judgment is due to be GRANTED.

This case will proceed to trial on the claim in Count I for disparity between the wages of Salies and Hood in the Warehouse/Driver position *after* Sailes received his CDL in August of 2011.

Dated this 18th day of June, 2013.

Karon O. Bowdre

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE